**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

"SIKHS FOR JUSTICE", SHIROMANI AKALI DAL (Amristar) a.k.a.. SHIROMANI AKALI DAL MANN, JEET SINGH, GURDEEP KAUR, JAGTAR SINGH, and JOHN DOE,

*Plaintiffs*,

v.

PARKASH SINGH BADAL,

*Defendant*.

No.: 12 CV 0806

The Honorable Lynn Adelman

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**
**FOR FAILURE TO EFFECTUATE SERVICE**

1. At the hearing on this Motion, held on February 21, 2013, the Defendant presented to the Court and tendered into evidence the original summons and complaint. The critical question arises – how did the Defense come into possession of these papers? The Defendant's only explanation is that they were served on a defense witness, Mr. Surinderpal Singh Kalra. Plaintiffs contend that the Defense possessed and tendered the papers because they had been served on the Defendant. On this dispositive issue there are four direct witnesses: Christopher and Joseph Kratochvil (the process servers), Mr. Kalra and the Defendant Parkash Singh Badal.

**THE BURDEN OF PROOF**

2. The burden the Plaintiffs will meet on this Motion is to show by a preponderance of the evidence that the Defendant was effectively served by the process servers on August 9, 2012.[1] *Purdue Research Foundation v. Sanofi-Synthelabo, S.Z.*, 338 F.3d 773 at 782 (7th Cir., 2003): "The precise nature of the plaintiff's burden depends upon whether an evidentiary hearing has been held. When the district court holds an evidentiary hearing to determine jurisdiction, the plaintiff must establish jurisdiction by a preponderance of the evidence."; See also *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707 at 713 (7th Cir., 2002). However, it must be noted that "[a] signed return of service constitutes prima facie evidence of valid service 'which can be overcome only by strong and convincing evidence."' *O'Brien v. R.J. O'Brien & Associates, Inc.*, 998 F.2d 1394, 1398 (7th Cir. 1993) (internal citations omitted).

**I. The Process Servers.**

3. In order to effectuate service of process upon the Defendant, Plaintiffs hired Christopher and Joseph Kratochvil to act as process servers. At the outset, it should be reiterated that both Christopher and Joseph are experienced and capable process servers who testified at the February hearing that they have been in the service of process business for 15 and 10 years respectively. The Kratochvil brothers testified that they serve between 10 and 30 papers a day, 4-5 days a week. Remarkably given this work-load, Christopher testified that he has never had a service thrown out for insufficient service of process. (Please see p. 10, lines 17-18 of the relevant portion of the hearing transcript, attached as Exhibit A). Additionally, the Kratochvils

[1] In a hearing into the proof of service issue, as here, the Seventh Circuit has held that the Defendant must rebut by "strong and convincing" evidence the presumption of service. *Relational LLC v. Hodges*, 627 F.3d 668 at 673-674 (7th Cir., 2010). This standard is applicable herein. In an abundance of caution, however, Plaintiffs will also demonstrate that Plaintiffs would meet any preponderance of the evidence standard.

testified that they routinely serve minorities, including those of Indian descent. (Please see p. 11, lines 5-6 of Exhibit A).

4. At the February hearing, after viewing a news clip of an interview conducted with the Defendant, Christopher Kratochvil positively identified the Defendant as the individual he served on August 9, 2012. (Please see p. 19, lines 14-16 of Exhibit A). Additionally, Joseph Kratochvil, testified at the hearing that, based upon the television news interview, he too could positively identify the Defendant as the individual the pair served at Oak Creek High School on August 9, 2012. (Please see p. 39, lines 1-2 of Exhibit A).

5. Subsequent to the hearing, the process servers had an opportunity to view Mr. Kalra in person. The process servers attended Mr. Kalra's deposition on March 11, 2013 and compared his physical appearance to the individual they recalled serving on August 9. Following the deposition, both process servers signed sworn and notarized affidavits, attached hereto as Exhibits B and C, in which they categorically deny that they served Mr. Kalra and testify that, without question, they properly served the Defendant.[2] This is precisely the sort of affidavit and testimony requiring "strong and convincing" rebuttal evidence from the Defendant. As will now be shown, the evidence proffered by the Defendant is insufficient.

## II. The Defendant

6. Defendant has offered up the testimony of numerous witnesses to convince this Court that he was not, in fact, served by the process servers on August 9. Astonishingly, the evidence that would be most convincing and seemingly easy to produce has not been offered – namely the

[2] The Kratochvils also note in their affidavits that they were shown a photograph of Mr. Kalra taken on August 9, 2012 at Oak Creek High School. In this photograph, Mr. Kalra appeared to be wearing a western business suit, whereas the person the Kratochvils served on that date was dressed in blue Indian garb. (Please see paragraphs 5 of Exhibits B and C).

Defendant's sworn testimony, or even an affidavit signed by Defendant under oath, that he was not served on August 9, 2012.[3] This omission necessarily shakes the very foundation of the Defendant's case. Without hearing from the Defendant himself, how can this Court make a ruling that, despite the testimony of the process servers to the contrary, the Defendant was not properly served?

7. In a case that provides guidance, the 7th Circuit found that even where a Defendant testified in person at a hearing into the sufficiency of service of process, this testimony alone was not sufficient to overcome the evidentiary weight afforded signed affidavits of a process server. In *Relational, LLC v. Hodges*, the 7th Circuit affirmed the district court's finding that, even though the defendant testified at the hearing that he was never served, his testimony was not credible enough to constitute the sort of "strong and convincing" evidence needed to overcome the credibility of the process server's sworn affidavit. *Relational, LLC v. Hodges*, 627 F.3d 668 at 672-673 (7th Cir., 2010).

8. In the instant matter, the Defendant has neither testified nor signed an affidavit denying that he was served on August 9, 2012 at Oak Creek High School. Despite the parade of witnesses thrown up by the defense, the one person who could shed much needed light on the situation has remained silent. Therefore, Plaintiffs respectfully suggest that this case warrants application of the so-called "missing witness rule."

9. According to the 7th Circuit, the missing witness rule allows the fact finder to draw a negative inference from an essential party-controlled witness' failure to testify. See, e.g.,

[3] At his deposition, Mr. Darshan Dhaliwal described a February, 2013 meeting in India for the Defendant's counselors and legal team to discuss the upcoming Court hearing. Despite the clear opportunity to get an affidavit from the Defendant, not one person in the meeting suggested it. (Please see pp. 149-150 of the Dhaliwal Deposition).

*Advocate South Suburban Hosp., v. N.L.R.B.*, 468 F.3d 1038 at 1049 (7th Cir., 2006) -- noting that the missing witness rule is a general, common sense attempt to codify the inference one can draw from a party's failure to call a witness. According to the 7th Circuit, this rule allows a negative inference to be drawn from another party's failure to call a witness where the missing witness is peculiarly in the power of the other party to produce. This power to produce is proven by showing: (1) that the witness is physically available only to the opponent; or (2) that the witness has a relationship with the opposing party that practically renders his testimony unavailable to the moving party. *Oxman v. WLS-TV*, 12 F.3d 652 (7th Cir., 1993).

10. It is apparent that the above requirements are met in the instant matter. As explained supra, the Defendant's testimony is essential and would certainly assist the fact finder (for purposes of this Motion, the fact finder is the Court) in determining whether the process servers properly effectuated service. Additionally, the missing witness in this case *is the other party*, thereby satisfying the power to produce and control element. Therefore, a negative inference should be drawn against the Defendant for his failure to testify on the matter of service.

**III. Mr. Surinderpal Kalra**

11. Against this unequivocal testimony of the process servers and the deafening silence of the defendant, the defense offers only Mr. Kalra to explain how the defense came to possess the original summons and complaint.

12. There is no question that on February 21st, the original summons and complaint was presented to the Court by Mr. Kalra. Two fundamental questions arise: how did he get those papers and what did he do with them? Mr. Kalra claims that he got the papers on August 9th at Oak Creek High School, but there were no witnesses to this service because at the moment he was served, and only then, there was no one within ten feet of him. (Please see p. 73, lines 14-17

of Kalra Deposition transcript). He has given two different and contradictory sworn statements as to what he did with those papers:

> (1) left them on the table at the high school – "I took those papers and put them on the table on the podium…thinking that they belong to the Department of Justice[.]" (Please see pre-hearing affidavit, attached as Exhibit D); and
>
> (2) put them in the trunk of his car on August 9th and totally forgot about them until he opened his trunk three days before the hearing.

13. Neither of these explanations is credible. The affidavit, in which Mr. Kalra stated that he left the papers at the high school, is contradicted by his court testimony and the affidavit offers no explanation of how he came back into possession of the papers at the Court hearing. His court testimony that he put the papers in his car trunk on August 9th and then did not see them or think about them again until he opened his trunk on February 18th is simply not believable.

**A. Mr. Kalra put the papers in his trunk and did not see them again until February 18th.**

14. At his deposition, Mr. Kalra testified that when he left the high school on August 9th he put his coat and a folder containing the papers in his car trunk. According to Mr. Kalra, when he returned home that evening he opened the trunk, removed his coat but did not see the folder or think about the papers. Between August 9th and February 18th, Mr. Kalra testified that he routinely opened the trunk of his car at least twice a week for grocery shopping. This would be approximately 50 trips to the grocery store between August 9th and February 18th, opening the car trunk twice for each trip (load and unload). Therefore, Mr. Kalra claims that while the folder with the papers was in the trunk during this entire time and he would have opened the trunk over

100 times, he did not see the folder even once. His only explanation for why he discovered the folder on February 18th is that it must have moved. (Please see p. 96 of Kalra deposition).

**B. Mr. Kalra did not think about the court papers in his trunk between August 9th and February 18th.**

15. For one to believe that Mr. Kalra did not think about the court papers in his trunk for this entire period, one would have to believe that Mr. Kalra was not thinking about the papers when he signed the affidavit on January 29th describing how he had received the papers and what he had done with them.[4]

16. Even more telling is a meeting of his Palatine, Illinois congregation which Mr. Kalra attended on December 8th. From the affidavits of the leaders of the congregation and the person who called the meeting we learn the following: (1) the purpose of the meeting was to discuss the Badal lawsuit and the service of summons controversy, and; (2) the meeting lasted four to five hours, and; (3) Mr. Kalra attended and spoke at the meeting and did not state or claim that he had received any court papers on August 9th. It defies belief that if the Badal summons and complaint were sitting in his car trunk during that meeting Mr. Kalra would not have thought about it and mentioned it. (Please see Ghuman and Kharoudh Affidavits, attached as Exhibits F and G).

---

[4] It should be noted that, according to the deposition testimony of Mr. Darshan Dhaliwal, the affidavit itself was procured by Mr. Dhaliwal at the request or direction of the Defendant's agents in India. On January 28th, they called Mr. Dhaliwal and emailed him a photograph of Mr. Kalra. The following day, Mr. Dhaliwal called and persuaded Mr. Kalra to supply an affidavit. (Please see pp. 92-100 and 105-107 of Dhaliwal deposition). This initial contact by the Defendant's agents with Mr. Kalra was reinforced when he was inexplicably sequestered with the Defendant's agents at the Pfister Hotel immediately before his hearing testimony. One of these agents was one Ananya Gautam, the Deputy Inspector General of the Punjab Police. Mr. Gautam has previously been identified in an affidavit supplied to this Court as having knowledge and command of threats against Plaintiffs' family members in India with the purpose of pressuring the Plaintiffs to drop the suit against the Defendant. (Please see Mann Affidavit, attached as Exhibit E).

17. If Mr. Kalra did not discover the court papers in his trunk on February 18th, how did he get the papers? It is more plausible that he received them from the Defendant's agents in the Pfister hotel room during his three-hour sequestration. If this were true, it could explain why Mr. Kalra, contrary to his sworn affidavit, having walked into court with the papers, testified that he had the papers in his trunk all along.[5]

**IV. Peripheral Witnesses**

18. At the February 21st hearing, the Defendant called a number of witnesses who testified that they did not see the Defendant at the high school on August 9th or that the Defendant was either at the Wisconsin State Fair or mall shopping during the afternoon of August 9th.

19. Plaintiffs characterize these witnesses as peripheral because they do not address the central question of how the Defense came to possess the original summons and complaint. The fact remains that if Mr. Kalra's testimony is not believable, the only explanation is that the Defendant was served.

**A. The State Department Witnesses**

20. Two members of the Defendant's Department of State security detail were authorized to testify. The primary witness was Martin O'Toole, the head of the Defendant's detail. Mr. O'Toole testified that at the time of the alleged service, the Defendant was shopping at the Boelter Superstore, following trips to the Wisconsin State Fair and the George Watts and Sons store. Although several photographs of the Defendant at the Fair and at the George Watts store were offered, there were no photographs of the Defendant in the Boelter Superstore. Moreover,

---

[5] The Defendant's representatives arrived from India on or about February 17th. Mr. Kalra claims he discovered the papers in his trunk on February 18th but made no attempt to reconcile this claim with his sworn affidavit of January 29th that he had left the papers in the Oak Creek High School. (Please see pp. 123-127 of Kalra deposition).

although surveillance videos that would have shown the Defendant in the store at 4:50 p.m. on August 9th were readily available until October, the security team made no effort to obtain these videos. This, despite knowing by August 10th that the Plaintiffs claimed to have served the Defendant at 4:50 p.m. on August 9th and after O'Toole had notified his team to be alert for attempts to serve process. Mr. O'Toole had no explanation for the failure to obtain this critical evidence since it would have verified (or nullified) his testimony.

21. Nor could Mr. O'Toole explain his extraordinary confrontation with the process server. He was ordered, apart from his normal duties and he could not explain why, to obtain a statement from the process server. He did this on August 31st, together with an associate, both in full protective gear including visible weapons, by confronting Christopher Kratochvil unannounced in his driveway. Mr. O'Toole told Mr. Kratochvil that he had not served the Defendant because the latter was with O'Toole at a mall at the time of the alleged service and had Mr. Kratochvil sign a statement to that effect. He did not give a copy of the statement to Mr. Kratochvil. Although Mr. O'Toole brought the statement to Court and relied on it to refresh his recollection he refused to show it to counsel or to the Court. State Department attorneys present even refused the Court's request for an *in camera* inspection of the statement. (Please see pp. 46-80 of Exhibit A).

22. Ordering Mr. O'Toole to obtain this statement was extraordinary in itself. Refusing to provide the statement for an in camera inspection betrays a State Department bias in the case.

This, together with the Boelter surveillance video, impeaches Mr. O'Toole's credibility even as a peripheral witness.[6]

**B. Mr. Gagandeep Virk**

23. Mr. Virk, a friend of the Defendant's family was visiting from Philadelphia on August 9th, 2013. Although he was with the Defendant's group the afternoon of August 9th, he was separated from the group at the Boelter Superstore. He tendered photographs he took of the Defendant at the State Fair and at the George Watts store but offered no photographs showing the Defendant at the Boelter Superstore. (Please see pp. 152-163 of Exhibit A).

**C. John Edwards**

24. John Edwards is the chief of police of Oak Creek, Wisconsin and was a panel member at the August 9th meeting at the Oak Creek High School. Although he was notified that the Defendant might attend the meeting he did not see him at the high school that night, and was not specifically notified that he would attend. Given the fact that the service was effected several minutes before the meeting and that the Defendant, like the process servers, may have left immediately after the service was made, it is not surprising that Mr. Edwards may not have noticed the Defendant. (Please see pp. 139-146 of Exhibit A).

**CONCLUSION**

25. Quite simply, the Defendant's Motion hangs entirely on the testimony and credibility of Mr. Kalra. We start with the incontrovertible fact that the Defense presented the original

---

[6] The second State Department witness, David Scharlat, did the advance check for the Boelter visit and did not accompany the Defendant's group to the Boelter store. It is not clear whether he rejoined the group at Boelter. (Please see pp. 146-152 of Exhibit A).

summons and complaint to the Court on February 21st . Only two possibilities have been offered as to how the Defense got those papers: Mr. Kalra was served or the Defendant was served.

26. If, as Plaintiffs believe, Mr. Kalra's testimony is not credible, Defendant cannot overcome the unequivocal testimony of the two experienced professional process servers, and the Defendant's own telling silence. The evidence that the Defendant was served preponderates. The Defendant's Motion should be denied.

Date: April 12, 2013

Respectfully submitted,

By: /s/ *Robert J. Pavich*______
One of Plaintiffs' Attorneys

Robert J. Pavich
Ian Levin
John Pavich
PAVICH LAW GROUP, P.C.
20 South Clark Street, Suite 700
Chicago, IL 60603
(312) 782-8500 (Telephone)
(312) 853-2187 (Fax)
Email: rpavich@pavichlawgroup.com

John O'Connor
State Bar No. 1014548
The Law Offices of John V. O'Connor
600 – 52nd Street, Suite 120
Kenosha, WI 53140
(262) 605-8400 (Telephone)
(262) 605-8403 (Fax)
Email: john@jvoconnor.com

12

