UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Sikhs for Justice, *et al.,*

        Plaintiffs,

    v.                                Case No. 12-C-0806

Parkash Singh Badal,

        Defendant.

POST-HEARING BRIEF
IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

## **INTRODUCTION**

Plaintiffs' process server did not serve Parkash Singh Badal. The evidence -- including testimony and information from two federal agents, a private security official, two entirely disinterested local store employees, the Oak Creek Chief of Police, the United States Attorney, the person who in fact was served, and an acquaintance of the Chief Minister, along with contemporaneous photographs, e-mails, and other documents -- demonstrates definitively that it would have been physically impossible to serve the Chief Minister on August 9th at Oak Creek High School because he was not there. CM Badal was shopping at Boelter Superstore, 17 miles away. Instead, the process servers erroneously served Surinderpal Singh Kalra, a Department of Justice-appointed interpreter for the community forum being held at the high school in the wake of the tragic temple shootings.

1

In the face of the overwhelming evidence that the Chief Minister was not served, the Plaintiffs have failed to meet their burden and as a result, Defendant's Motion to Dismiss should be granted.

## PROCEDURAL HISTORY AND LEGAL STANDARD

A.     Procedural History

On August 8, 2012, plaintiffs filed a complaint against Parkash Singh Badal, the Chief Minister of the State of Punjab, India.  R. 1.  On August 30, 2012, CM Badal filed a motion to dismiss, arguing that the plaintiffs had failed to effectuate service.  R. 3.  On October 18, 2012, the plaintiffs filed the returned, executed summons which reflected that plaintiffs were claiming that CM Badal had been served on August 9, 2012 at 4:50 p.m. at Oak Creek High School.  R. 7.

On October 23, 2012, CM Badal's counsel notified the court that counsel was in the process of complying with the federal *Touhy* regulations to obtain authorization from the State Department for agent testimony and State Department documents which would prove that CM Badal was not served.  R. 8. On December 10, 2012, counsel filed a follow-up letter with the Court indicating that such evidence had been authorized.  Attached to that filing with the affidavits of Special Agents Martin O'Toole and David Scharlat, describing the security detail CM Badal's whereabouts on August 9, 2012, and the fact that he had not been served.  R. 11.

Three days later, plaintiffs filed a letter and attached affidavit of the process server who claimed to have served CM Badal.  R. 13.  The court scheduled the matter for an evidentiary hearing.  R. 14.  Thereafter, Judge Randa recused himself

2

from the matter and this Court was assigned.  After a telephone status conference on January 14, 2013, this Court set the matter for an evidentiary hearing on February 21, 2013.  R. 19.   As described more fully herein, the evidence at the hearing proved that CM Badal was nowhere near Oak Creek High School on August 9th, was not served at any time while he was in the United States from August 7-12, 2012, and that the case was a simple case of mistaken identity:  the process server served the wrong person.

      B.    Legal Standard

Defendant may enforce service of process requirements through a pretrial motion to dismiss.  See Fed. R. Civ. P. 12(b)(5).  Mere knowledge of the lawsuit is insufficient.  A plaintiff must comply with the service requirements of Rule 4. *McMasters v. United States,* 260 F.3d 814, 817 (7th Cir. 2001).  If plaintiffs fail to effect proper service, the district court in its discretion must either dismiss the suit or specify a time within which the plaintiff must accomplish service.  Fed. R. Civ. P. 4(m); *Cardenas v. City of Chicago,* 646 F.3d 1001, 1005 (7th Cir. 2011).

Typically, a process server's signed return of service provides *prima facie* evidence of valid service.  When the district court conducts an evidentiary hearing on the service issue, however, plaintiffs bear the burden to prove valid service by a preponderance of evidence. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003). In other words, the Plaintiffs here must prove it is "more likely than not" they served Chief Minister Badal.  *See generally Butler v.*

3

*Oak Creek-Franklin School Dist.,* 172 F. Supp. 2d 1102, 1119 (E.D. Wis. 2001)

(Adelman, J.).  The bottom line here is that Plaintiffs have the burden of proof.

In light of the multiple versions of the return of service, the process server's

lack of credibility, and the conclusive evidence this is a case of mistaken identity,

Plaintiffs failed to prove proper service by a preponderance.  The case must be

dismissed.

## ARGUMENT

I.     Plaintiffs fall far short of proving it is more likely than not they served Chief
       Minister Badal.  Instead, the evidence overwhelmingly proves a simple case
       of mistaken identity.

Plaintiffs claim they served CM Badal with the summons and complaint at

approximately 4:50 p.m. on August 9, 2012, at the Oak Creek High School.

       A.     Chief Minister Badal was under a protective detail throughout his
              stay, and was not served with any legal papers at any time.

Parkash Singh Badal is the Chief Minister ("CM") of the State of Punjab,

India.  On August 7, 2012, he arrived in the United States.  Throughout his six-day

stay, from the time he got off the airplane at O'Hare, CM Badal was under a

protection detail conducted by the United States Department of State's Diplomatic

Security Service ("State Department").  Tr. 48-50, 63, 165-67.[1]  Martin O'Toole, a

special agent ("SA") with the State Department, was designated as the agent in

charge of the protection detail.  Tr. 48.  State Department SA David Schlarlat and

---

[1] In this brief, "Tr." followed by a number refers to a page of the transcript from the February 21,
2013 evidentiary hearing; and "R." followed by a number refers to a document entered on the district
court's docket.

Brown County Det. Sgt. Monica "Nikki" Jossart were among several other law enforcement agents also on the detail.  Tr. 146, 163.

SA O'Toole or another agent was in CM Badal's immediate presence ("within arm's reach") whenever he was outside his hotel room.  They also maintained a guard at his hotel room door.  See Tr. 48, 56, 58, 169.  O'Toole, Scharlat, and Jossart all testified that at no time during his stay in the United States was CM Badal ever approached by a process server or served with papers.  Tr.  63-67, 149, 164-65.

B. At the time the Plaintiffs claim he was being served, the Chief Minister was miles away from Oak Creek High School shopping at Boelter Superstore.

1. Exhibit 101 and the agents' testimony

Exhibit 101 is a copy of emails SA O'Toole sent throughout the afternoon of August 9, 2012.  Sent for security purposes, the emails were intended to contemporaneously track CM Badal's location and movements.[2]  Tr. 51-53. Corroborated by the testimony of O'Toole, Scharlat, Jossart, Jessica Piorier, Patricia Guist, and Gagandeep Virk, Exhibit 101 establishes CM Badal was never at Oak Creek High School on August 9:

- 12:56 pm.    Departed for State Fair
- 1:20 pm.    Arrived at State Fair.
- 2:30 pm.    Departed State Fair for George Watts.
- 2:54 pm.    Arrived at George Watts & Son Store, 762 Jefferson St., Milwaukee, WI.
- 4:23 pm.    Departed George Watts for Boelter Superstore Store.
- 4:49 pm.    Arrived at Boelter Superstore, 4200 N. Port Washington Rd, Milwaukee, WI.
- 5:09 pm.    Departed Boelter Superstore and returned to hotel.

---

[2] SA O'Toole explained that the times reflected on the email are one hour ahead (in Eastern Daylight Time) because of the location of the State Department's server where emails are maintained.  Tr. 53.

5

Exh. 101, Tr. 51-54, 165, 169.

Critical to this itinerary is that **at 4:50 p.m., the time at which plaintiffs claim their process server was at OCHS serving the papers, CM Badal was shopping at Boelter Superstore, 17 miles north of the school**. Tr. 51, 55-56, 146-47, 164-66. At no time on August 9th was the Chief Minister at Oak Creek High School. Tr. 51, 62, 148-49, 151. And at no time that day was the Chief Minister approached by a process server or anyone else who handed him papers. Tr. 62.

As further corroboration for CM Badal's whereabouts throughout the afternoon of August 9, the Court heard testimony from two witnesses who do not know the Chief Minister, had no involvement with his security or his travels, and who had no interest in the outcome of this litigation: Jessica Piorier and Patricia Guist.

### 2. Ms. Piorier -- George Watts & Sons

Ms. Piorier is the buyer at George Watts. She recalled August 9th because the "Prime Minister of Punjab" and a group traveling with him visited George Watts that day, protected by a federal security detail. Tr. 81-82, 97, 99-100; Exh. 102, 103. Ms. Piorier recounted that the entourage arrived at Watts around 2:30 p.m., shopped and had tea for about two hours, and left around 4:30 p.m. Tr. 82-83, 85-86, 90. Ms. Piorier identified photographs of CM Badal and others with him at George Watts that day. Tr. 86-87, 93-95; Exh. 113, Exh. 114.[3]

---

[3] Gagandeep "Greg" Virk and SA O'Toole reviewed Exhibit 113. In addition to recognizing it as having been taken at Watts that day, they identified the four gentlemen in the photograph as, from

Case 2:12-cv-00806-LA   Filed 05/03/13   Page 6 of 26   Document 46

Further corroborating CM Badal's visit to Watts that day, Ms. Piorier identified an email she sent to a New York vendor, in which she wrote that she was working with "a very important client right now (a prime minister!)…" The email was time-stamped August 9, 2012 at 4:13 p.m. (CDT). *Id*. at 87-91; Exh. 102. Ms. Piorier was "very certain" the Chief Minister's group was still at the store when she sent the email. Tr. 87, 89.

Ms. Piorier's testimony is compelling. As this Court characterized her during the hearing, she has no "dog in this fight." Tr. 176. Ms. Piorier does not know any of the people involved in the litigation, has no interest in the outcome of this case, and her email corroborates her own recollection and that of the agents regarding Chief Minister Badal's whereabouts that afternoon. The CM was at Watts until approximately 4:20 pm.

### 3. Ms. Patricia Guist -- Boelter Superstore

Like Jess Piorier, Patricia Guist has no dog in this fight. She is a manager of the Boelter Superstore, a restaurant supply store located seven miles north of Milwaukee. Tr. 103. She does not know any of the people involved in the litigation, and has no interest in the outcome of the case.

The CM's entourage arrived at Boelter around 4:45 pm, shopped for 20 or 30 minutes, and left shortly after the store's 5:00 p.m. closing time. Tr. 62, 104-06,

---

left: Chief Minister Badal, Greg Virk, Harbans Virk, and a doctor from Chicago. Tr. 60-61, 72-73, 157. The two also identified Exhibit 114 as having been taken at Watts, and depicting Chief Minister Badal, a security agent named Mr. Rampal, and Harbans Virk. That photograph was time-stamped as having been taken at 3:12 p.m. CDT. Tr. 61, 73, 157-59.

7

117-18, 148, 150.[4]  Ms. Guist was working that day, and described the visit as
"pretty memorable":  "I mean, this doesn't happen every day, you know, when a
group like this comes in, so it was pretty memorable."  Tr. 114, 118-19.  Ms. Guist
was confident the group was at the store in the very late afternoon of August 9th,
close to closing time, based on an email she wrote and based on sales documents
generated by Boelter for purchases made by members of the group.  Tr. 108-113;
Exh. 104-106, 123.

Ms. Guist identified orders placed by members of CM Badal's entourage,
including a potato peeler purchased by an individual named "Amrik" at 4:43 p.m. on
August 9th,[5] and items ordered for the "Diplomatic Party of the Chief Deputy of
Punjab."  Tr. 109-113; Exh. 104-106, 123.

Ms. Guist recalled that a little after the store's 5:00 pm closing time, all but
one of the people in the entourage left.  One person (later identified as Gagandeep
"Greg" Virk) stayed behind because he needed to go to the bank, and Ms. Guist
offered to drive him before the bank closed at 5:30 pm.  Tr. 106-07, 116, 119-20.
When they arrived back at Boelter after the trip to the bank, Jossart returned to
Boelter to pick him up and take him back to the hotel to re-join the group.  Tr. 162,
166, 169.

Once everyone had left Boelter, Ms. Guist sent an email to Boelter
management.  Tr. 108; Exh. 104.  In the email, which is time/date stamped for

[4] At approximately 3:30 p.m. on August 9, 2012, SA Scharlat went to Boelter to check the store for
security in anticipation of Chief Minister Badal's entourage visiting the store.  Tr. 104-105, 115, 147-
48, 150.
[5] Gagandeep Virk identified "Amrik" as a doctor from India with whom the Chief Minister was
traveling.  Tr. 159.

8

Thursday, August 9 at 6:07 p.m., Ms. Guist stated: "Today, we had a visit from the Chief Deputy of Punjab and his diplomatic party." *Id.*

In light of the testimony from Ms. Piorier and Ms. Guist, and the emails and documents from Boelter and George Watts, and corroborated by the testimony of the agents who conducted the protective detail, it is physically impossible for the Chief Minister to have been served by a process server at 4:50 p.m. in Oak Creek.

4.    Gagandeep "Greg" Virk

Greg Virk is a 30 year old business manager for an IT company in Philadelphia, and is a family friend of CM Badal. Tr. 152-53, 161. Mr. Virk has met the Chief Minister many times both in the United States and India. Tr. 161. Mr. Virk and his uncle, Harbans Virk, were in Wisconsin and met the Chief Minister on August 9th at the State Fair. Tr. 54-55, 153-55. Mr. Virk identified photographs taken at the State Fair of the Chief Minister and others in his entourage that day, (taken and time stamped for the mid-afternoon). See Tr. 57-59, 154-57; Exh. 110-112. Mr. Virk explained that after the State Fair, he accompanied the Chief Minister to George Watts & Sons, and thereafter to Boelter Superstore. Tr. 55-56; 157-59. They made no stops or detours between the State Fair and George Watts, and likewise no stops or detours between Watts and Boelter. Tr. 56, 159.

Mr. Virk recalled that when the entourage arrived at Boelter, the store was still open. Tr. 160. He confirmed Ms. Guist's account that he needed to go the bank, left Boelter with Ms. Guist to drive to the bank a little after 5:00 p.m., and

arrived back at Boelter around 5:15 or 5:30, after it had closed and after the rest of the entourage had already left. Tr. 159-162. Jossart returned to Boelter to pick him up, and they arrived back at the hotel around 6:00 p.m. Tr. 162, 166, 169-70.

According to Mr. Virk, during the entire afternoon when Mr. Virk was with the Chief Minister, the Chief Minister never went to Oak Creek High School and was never served with papers. Tr. 162.

C. Events at Oak Creek High School that day

The plaintiffs' process server, Christopher Kratochvil, has testified and repeatedly sworn under oath that he served the papers for the lawsuit at Oak Creek High School on August 9, 2012 at 4:50 p.m. Kratochvil states he served a slim, thin, elderly gentleman, 5'11 to 6' tall, with glasses and a white full beard who was standing in front of the main stage prior to the start of the August 9th program at OCHS. Tr. 15. In fact, an elderly, thin, 6' tall gentleman, standing in front of the stage just prior to the start of the program, was served with the exact legal papers in question -- the ones bearing Kratochvil's original process server stamp. See Tr. 120-125; Exh. 100, 100A. That person was Surinderpal Singh Kalra.

The August 9th event at OCHS was arranged by the U.S. Department of Justice and the local United States Attorney's Office. See Exh. 119. The government had requested Mr. Kalra attend the event to serve as an interpreter. Tr. 121; *see also* Exh. 100B (email invitation to Mr. Kalra and directions to Oak Creek High School) and Exh. 120 (email of AUSA Susan Knepel identifying Surinderpal Singh and one of the two interpreters at the August 9 event).

Mr. Kalra testified at the February 21 hearing and in a subsequent deposition that while standing in front of the high school stage prior to the start of the event, someone quickly approached him, handed him some papers, and quickly walked away. Tr. 123; R. 33-1 at 68-76. Mr. Kalra took the papers, forgot all about them because they did not mean anything to him, and then discovered them in the trunk of his car several months later. [6] R. 33-1 (Deposition Tr. 89-110).

Information from James Edwards, Oak Creek Chief of Police, and United States Attorney James L. Santelle, both of whom served on the panel for the August 9th community forum, corroborate Mr. Kalra's recollection. Tr. at 139, 144; Exh. 115-117.[7] Chief Edwards did not see CM Badal there. After the formal part of the event, Chief Edwards spent considerable time discussing security matters with a large contingent from the Sikh community. "I was introduced to quite a few people who were important in the Sikh community," but the Chief Minister was not among them. Tr. 142. Moreover, the Oak Creek Police Department conducted operational planning and security for the event. Tr. 140. If a dignitary or a protective detail had planned to attend the event, the Oak Creek Police Department would have been notified. Tr. 140-41. He explained they were notified the Chief Minister might possibly show, but in the end, the Chief Minister did not attend. Tr. 140-151.

---

[6] Mr. Kalra's lack of focus on the papers, and the fact that he quickly forgot about them, is certainly understandable. He was at the August 9th community forum to assist the Sikh community after the horrific and senseless shootings which had just occurred.

[7] The Department of Justice also provided a handout listing the moderator and "Key Community Leaders" who attended the event. Among them were Chief Edwards, USA Santelle, representative from the temple and for victims' families, and representatives from law enforcement and Washington D.C.-based organizations. The Chief Minister's name did not appear on the handout. Exh. 119.

11

Mr. Kalra's recollection is likewise independently verified by United States

Attorney James L. Santelle:

> **Jim Santelle was aware before the program started that some papers were received by the interpreter**, who was not on the stage.  Someone from the Gudwara [congregation] had the papers and approached Jim about what the papers were.  Because the program was beginning, Jim said that he would talk with them about the papers after the program, but then after the program, there was no discussion, and Jim does not know what happened to the papers.

Tr. 138; Exh. 120 (email from AUSA Knepel (emphasis added)).

All of this evidence proves convincingly that CM Badal did not attend the

August 9th community forum, and that the summons and complaint were served on

Mr. Kalra, not on Chief Minister Badal.

> D.     The only "evidence" supporting the plaintiffs' position is the incredible, unreliable testimony of plaintiffs' process server, Christopher Kratochvil.

Christoper Kratochvil's information and testimony is rife with

inconsistencies, contradictions, and impossibilities.  It cannot support a finding that

it is "more likely than not" that CM Badal was served.

The testimony of and exhibits from the numerous other disinterested

witnesses, from store employees to law enforcement officials (those who, in the

words of the Court, have "no dog in this fight." Tr. 176), establish beyond any doubt

that CM Badal was not at Oak Creek High School on the afternoon of August 9,

2012.  But even considered in isolation, Kratochvil's testimony is not sufficiently

credible to establish proper service by a preponderance of the evidence.

12

1. Kratochvil's conflicting statements regarding whether he actually believes he served CM Badal.

Kratochovil's memory has "improved," becoming more and more certain about the August 9th service as time goes on and as the plaintiffs have become aware of the problems with his information. Kratochvil claims to have had a very brief encounter with CM Badal at Oak Creek High School on August 9th -- one lasting just long enough to hand him the complaint. Id. 15. Based on this brief encounter, Kratochvil initially swore under oath only that "[u]pon information and belief," he had served CM Badal. Tr. 27; Exh. 125; R. 7. At the evidentiary hearing before this Court on February 21, 2013, Kratochvil similarly hedged, testifying that based on a news clip of Badal, he "appears" to be the person who he served. Tr. 19; R. 43 at 3.

However, after the hearing, when Kratochvil was undoubtedly aware of his mistake, Kratochvil became much more certain of the identification (through his seemingly retro-engineered view of the incident). On March 14, 2013, Kratochvil swore under oath that "there is no question in my mind" that CM Badal was the person he served. R. 33-2 (March 14, 2013 Affidavit at ¶ 7). This ever-improving sense of certainty undermines his credibility.[8]

2. Kratochivil's conflicting versions of his observations of Chief Minister Badal at Oak Creek High School on August 9, 2012.

In his October 26, 2012 affidavit (which plaintiffs filed with the Court in December 2012 after receiving the affidavits of the two agents), Kratochvil swore

---

[8] His lack of genuine experience in identifying Sikh gentlemen, particularly those whose distinguishing facial features are often, in large part covered, by beards, moustaches, and turbans, make Kratochvil's identification and testimony even more suspect.

13

that he observed CM Badal and then "notified my co-worker that I had spotted the defendant." Tr. 29; Exh. 126; R.13-1. At the evidentiary hearing, however, Kratochvil described the circumstances differently. Tr. 30. He testified that "[a]ctually, my co-worker, Joe, spotted him originally, pointed him out to me."[9] Tr. 14.

As another obvious example of Kratochvil's ever-changing account of August 9th, Kratochvil swore in his affidavit that he first saw CM Badal standing on the floor of the auditorium in front of the stage, talking to a man "wearing Indian garb." R. 13 at p. 2. He said there were two men in western style business suits around him. *Id.* In contrast, at the hearing, Kratochvil testified he was "positive they were all wearing Western clothes. He was the -- the individual I served was the only one that appeared to be wearing Indian attire in that small cluster of people that were together there." Tr. 16.

>    3.    Kratochvil's conflicting versions of what he did after service of the complaint.

Kratochvil testified on direct examination that after accomplishing service, he went home. Tr. 19-20. His brother contacted him the same evening, and confirmed he (the brother) had just seen CM Badal, the person they served, on television. Tr. 19-20. When confronted on cross examination with the fact that he had signed two *different* typed affidavits of service, both dated August 9 (Exhs. 124

---

[9] Joseph testified that he had only a photograph to use to try to make the identification, that he was 40 feet away from the person, who was turned off to the side, when he made the supposed identification. Tr. 36, 38, 42. Joseph testified "We both -- I saw him first, I guess, technically. I said, I believe that's the gentleman we're attempting to serve." Tr. 37. Joseph "believe[s]" they served the right person. Tr. 39.

and 125), Kratochvil changed his story and said that perhaps after accomplishing service, he had gone to the office and dictated the two affidavits before going home. Tr. 26-29. When pressed further, he claimed no recollection whatsoever of when he completed the affidavits, or why he signed the two different affidavits, *both dated August 9th.* Tr. 26-29.

Perhaps as a way to explain his initial story about going home, Kratochvil conceded that he may have signed the affidavits on a later date, even though they were dated and notarized August 9, the same day of the purported service. Tr. 26. Kratochvil had no explanation as to why he needed to prepare two different affidavits of service. Tr. 28. In fact, Kratochvil eventually could not even remember what day of the week he served the complaint or what actions he took after the purported service. Tr. 27. "… [T]o be honest with you, I don't take notes on when I fill out the affidavit…. To be honest with you, I don't really recall." *Id.*

4.  Kratochvil gave conflicting information on the height and weight of the person served.

Kratochvil testified that prior to serving the summons and complaint, he was not informed of Badal's height and weight. Tr. at 25. He had only video and photographs. Tr. 11. Kratochvil's initial (purportedly contemporaneous) affidavits memorializing the service gave no physical description of the person he had served. Exh. 124, 125. In contrast, however, in his October 26th affidavit, Kratochvil swore under oath that CM Badal was 5'-11" or 6-feet tall and had medium build. R. 13-1; Exhibit 126. At the February 21 hearing, Kratochvil said that the person served was a "tall, thin gentleman…. He was rather tall and thin and elderly." Tr. 15. In

15

fact, CM Badal is taller than 6'2", and his build (while not overly heavy) would certainly not be described as slim or thin. Tr. 161-162; Exhs. 111-112.

> 5. Kratochvil gave conflicting information on what Badal was wearing.

In Kratochvil's two affidavits of service, he provided no description of what CM Badal was purportedly wearing on August 9th. See Exhs. 124, 125. In his October 26, 2012, affidavit, Kratochvil stated that CM Badal was wearing a "tunic-like" outfit," but did not provide the color of the outfit or any further description. Exh. 126. At the February 21, 2013 hearing, Kratochvil changed the description, simply calling the clothing "Indian garb," but again with no color provided. Tr. 15. Finally, in his March 14, 2013 affidavit (and referenced in a footnote in Plaintiffs' brief), Kratochvil claimed for the first time that Badal was wearing "blue Indian garb." R. 33-2 (March 14, 2013 Affidavit at ¶ 5); R. 43 at 3 n.2.

In fact, the contemporaneous photographs of CM Badal taken on the afternoon August 9th show Badal was wearing an un-tucked, grey Western style button-front shirt and slacks of a matching grey fabric. Exhs. 110-114.

> 6. Kratochvil never confirmed that day that the person he served was Badal, and no one else at the August 9 event corroborates Kratochvil's version of what happened.

Kratochvil testified that the person he served did not speak to him. Tr. 15. Kratochvil admitted he did nothing to confirm that the person served was, in fact, CM Badal. He asked for no identification, nor did he speak with anyone else at the event (other than his brother, who was there for the same short time and who also had no prior interaction with CM Badal). Of the dozens of people at Oak Creek

16

High School on August 9, 2012, not one has come forward to confirm that Badal was there. In fact, during the telephonic status hearing with the Court on January 11, 2013, Plaintiffs indicated that they would call several "citizen witnesses" who had been in attendance at the August 9th event and who would verify that CM Badal was there. No such evidence was ever produced. Nor could it have been, since no such evidence exists.

In sum, Plaintiffs characterize the process servers as "experienced and capable" whose services "remarkably" have never been "thrown out" in 15 years. R. 43 at 2. That is "remarkable," given the obvious error Kratochvil made here.

   E.   Plaintiffs' Brief is a combination of unfounded legal theories
        and baseless attacks on the witnesses.

Faced with the avalanche of evidence proving the mistake by the process server, Plaintiffs proffer frivolous legal theories and undertake disingenuous, unfair and unfounded attacks on witnesses, in a desperate attempt to keep this case alive.

   1.   Plaintiffs' missing witness theory.

Plaintiffs incorrectly characterize almost all of the witnesses, from the agents to the store employees, as "peripheral" because those witnesses don't speak to Mr. Kalra's or (or defense counsel's) possession of the papers. To the contrary, the witnesses and exhibits speak to the sole, central issue in the case: whether or not CM Badal was served with the summons and complaint. Moreover, the defense *did* explain how they received the papers: Plaintiffs' process server mistakenly served Surinderpal Kalra. When Mr. Kalra located the papers, he immediately informed and provided them directly to defense counsel. Defense counsel immediately filed

the papers with the Court, the day *before* the hearing.[10]  R. 24 (original summons and complaint, with file stamps and original process server signature, filed by defendant's counsel a day before the hearing, February 20, 2013).

Plaintiffs argue that CM Badal should have provided sworn testimony at the evidentiary hearing, or submitted an affidavit, regarding the service issue.  R. 43 at 3-5.  They suggest the Court cannot make a finding that CM Badal was not served, without Badal's testimony.  And because Badal did not do so, they suggest the Court should apply the "missing witness rule." *Id.* at 4-5 (citing *Relational, LLC v. Hodges,* 627 F.3d 668 (7th Cir. 2010), *Advocate South Suburban Hosp. v. N.L.R.B.,* 468 F.3d 1038, 1049 (7th Cir. 2006) and *Oxman v. WLS-TV,* 12 F.3d 652 (7th Cir. 1993)).

Plaintiffs misconstrue the missing witness rule, a rule which is most often applied in the trial context, as an instruction to the jury.  First, the absence of evidence "does not cut in favor of the one who bears the burden of proof on an issue." *N.L.R.B. v. Louis A. Weiss Memorial Hosp.,* 172 F.3d 432, 446 (7th Cir. 1999)(citing *Howard v. Wal-Mart Stores, Inc.,* 160 F.3d 358, 360 (7th Cir. 1998)); *Boardman v.*

---

[10] Plaintiffs' theory of this case is factually outlandish and frivolous.  They theorize that:  Mr. Badal was served as their process server claims, took them back to India with him, gave them to other government officials who brought them back with them to the United States when they came on February 12th to assist counsel in preparing for the hearing, and gave the papers to Mr. Kalra while he waited at the Pfister Hotel prior to his testimony.  R. 43 at 8.

To believe this, one would have to accept the following:  (1) the three law enforcement officers conspired and lied about the Chief Minister's whereabouts;   (2) the two store employees and Mr. Virk were in on that conspiracy, and lied throughout their testimony about the Chief Minister's whereabouts; (3) the State Department somehow dummied up an email for use to falsely establish the Chief Minister's whereabouts; (4) photographs were doctored to show the Chief Minister at the State Fair and Watts, as the witnesses testified; (5) United States Attorney  James L. Santelle lied about knowing the interpreter had been served with papers; (6) counsel for the defense obtained the papers from the government delegation from India and electronically filed them, before the papers were even given to Mr. Kalra; and (7) counsel for CM Badal suborned perjury during the hearing and Kalra's deposition, when they allowed Mr. Kalra to testify that he gave the papers to Steve Biskupic within a day of locating them.

18

*National Medical Enterprises,* 106 F.3d 840, 844 (8th Cir. 1997) (explaining that drawing adverse inference from failure of a party to put on a witness relevant to an issue is "most reasonable" when it is the party with the burden of proof on that issue who fails to do so); *Oxygenated Fuels Assoc. Inc. v. Pataki,* 293 F. Supp. 2d 170, 176 n.2 (N.D.N.Y. 2003). That the Chief Mihister was not called as a witness or did not provide an affidavit cannot inure to the benefit of Plaintiffs, who bear the burden of proof here.

Second, the rule does not apply when potential testimony would have been cumulative or was equally available from other witnesses. Here, had CM Badal testified, he obviously would have testified he had not been served and instead was shopping at Boelter at 4:50 pm on August 9, testimony which would have been cumulative of the testimony of O'Toole, Schlarlat, Jossart, Piorier, Guist, Virk, Edwards and Kalra. The Plaintiffs have not described any evidence they think might have been so peculiarly within CM Badal's control as not to be cumulative.

Third, and most obviously, application of an adverse inference against a defendant in these circumstances would be fundamentally unfair. If a defendant takes issue with plaintiff's affidavit of service, under Plaintiffs' view the defendant must appear in court for testimony (and subject himself to service), as the only way to avoid the adverse inference. CM Badal has taken the position from the outset of this lawsuit that Plaintiffs failed to serve him. Despite Plaintiffs' suggestion to the contrary, there is no additional light CM Badal possibly could shed on the process

server's mistake, as he was at least 17 miles away when the erroneous service occurred.

If the missing witness rule has any applicability here, it would apply to the "witnesses" that plaintiffs promised to present at the hearing -- those several "citizen witnesses" who plaintiffs claimed had been in attendance at the August 9th event and who would supposedly were going to verify CM Badal's presence there. No such evidence was ever produced, and for obvious reason:  CM Badal was not there.

        2.    Plaintiffs' unfounded attacks on the State Department witnesses

Plaintiffs suggest that the State Department agents' testimony and information should be rejected for three reasons:  (1) the State Department did not try to obtain or preserve video footage from Boelter; (2) the circumstances of O'Toole's later interview of the process server and the fact that he did not provide a copy of the written statement to Kratochvil; and (3) the State Department's refusal to provide the written statement to the Court or counsel during the evidentiary hearing.  Plaintiffs' attacks are meritless.

First, what possible reason would the State Department have for getting video surveillance from Boelter?  The State Department was not responsible for investigating this matter.  They had no responsibility or burden to prove service or the lack of service.  Their responsibility was the Chief Minister's safety.  '

Second, as this Court is surely aware, law enforcement officers do not typically leave copies of a written interview statement with the interviewee.

Third, O'Toole's and the State Department's refusal to provide the written statement during the hearing does not "betray[] a State Department bias," (R. 43 at 9) but instead demonstrates an attempt to comply with its own (*Touhy*) regulations. Despite knowing since at least December 10, 2012 about the State Department security detail, and having been informed by CM Badal's counsel's letter of October 23, 2012 referencing compliance with the *Touhy* regulations, Plaintiffs never made any request (*Touhy* compliant or not) for any information from the State Department. See R. 11. CM Badal made a proper request, and the State Department agents were allowed to testify at the hearing and submit an affidavit.

### 3. Attempts to discredit Virk and Edwards

Plaintiffs fault Greg Virk for being "separated from the group" at Boelter, and for failing to take pictures there. In fact, according to Virk's testimony under cross examination by the plaintiffs, Virk separated from the group "a little after 5:00 pm," and rejoined the group back at the hotel. There was no suggestion in any testimony from Virk or any other witness that Virk was not with CM Badal at Boelter, around 4:50 p.m. Tr. 162.

With respect to the "failure to take pictures," Virk was under no obligation to photograph CM Badal's 20 minute stop at a restaurant supply store. That fact is not a reason to discount Virk's testimony about the events that day.

Plaintiffs attempt to explain away or ignore Chief Edwards' testimony by suggesting he may simply not have noticed CM Badal at the event at the high school. But that argument ignores Chief Edwards' meetings with important

Case 2:12-cv-00806-LA   Filed 05/03/13   Page 21 of 26   Document 46

members of the community immediately after the event, and ignores the fact that the Oak Creek Police Department was conducting security at the event and would have been notified if a security/protective detail had arrived.

> 4. Plaintiffs' attempts to discredit Mr. Kalra are unfair and unfounded.

Having made no headway on cross examination with Mr. Kalra at the evidentiary hearing, plaintiffs sought Mr. Kalra's post-hearing deposition, and now try to rely on several "gotcha" moments from that three-hour deposition. Mr. Kalra is a 69-year-old retired business analyst who had never previously been asked or required to testify in court or a deposition, and, like so many of the other witnesses, has no dog in this fight. R.33-1 (Deposition Tr. 5-7). Plaintiffs' attacks on Mr. Kalra are unfair and unfounded.

First, Mr. Kalra has no connection with the Defendant. Tr. 38. Mr. Kalra considers himself to be a human rights activist and has helped prepare protest petitions seeking relief for human rights abuses. R. 33-1 at 33-38. Mr. Kalra served as an interpreter at the August 9 DOJ event out of a sense of duty and as a natural follow-up to the services he supplied on the day of the tragic shooting. R. 33-1 at 44-48.

Second, Mr. Kalra's account of August 9 has been independently corroborated by the Chief of Police and the United States Attorney.

Third, Plaintiffs' attacks on the credibility of Mr. Kalra are nothing more than innuendo and an entirely unfair and unfounded twisting of his words. For example, they contend that Mr. Kalra's presence at the Pfister Hotel with members

22

of the government delegation from India somehow casts a shadow over his testimony. In fact, Mr. Kalra was at the Pfister because witnesses were sequestered during the 5-hour hearing. Kalra testified that while at the Pfister, he did not discuss his testimony with anyone and simply passed the time by reciting scripture:

> A:      I was actually so much in myself. I was doing my part -- I was in my heart of heart reading scriptures -- reciting scriptures. …

R. 33-1 at 146. He also made clear that he was never told what to say:

> Q:      Did they tell you what they expected you to say?
> A:      No.
> Q:      Did you tell them what you expected to say?
> A:      No. Why would I?
> Q:      You didn't discuss your testimony at all?
> A:      No. I did not discuss with them.

R. 33-1 at 149. Plaintiffs unfairly and purposefully ignore this testimony.

As another unfair attempt to discredit Mr. Kalra, Plaintiffs contend that Mr. Kalra must have been lying when he said he had not noticed the folder containing the summons and complaint in his trunk until recently, and that he didn't think about the court papers until he was contacted about the lawsuit in late January. R. 43 at 6-7. But of course, as Mr. Kalra explained, he paid no attention to the papers when he first received them, as he did not know what they were. Given that he had no awareness of the litigation, there is absolutely no reason to believe he would have appreciated their significance or noticed them in his trunk.

Likewise, when he signed the affidavit in late January, there is every reason to believe that Mr. Kalra simply had forgotten that, over five months ago, he had

23

received some unidentified papers from an unknown person at the start of the community forum, did not appreciate their significance, put the unidentified papers into his folder, and later left them in the trunk of his car.

As yet another example, Plaintiffs twist Mr. Kalra's use of the word "lawsuit" to claim that Mr. Kalra gave conflicting testimony about when he learned of this matter. Mr. Kalra testified that he first learned of the "lawsuit" after receiving the subpoena in February of 2013. R. 33-1 (Deposition Tr. 121). Plaintiffs dispute this by submitting affidavits contending that Mr. Kalra discussed the lawsuit in December 2012. Yet Mr. Kalra also testified that he had previously read about lawsuits against Chief Minister Badal.

> Q:    What do you know about the lawsuit itself? Do you know what the claims are or anything about what's being charged in the lawsuit?
>
> A:    Well, I have read in the newspapers. As I said before, I'm a reader of newspapers, and I read in the newspaper that Sikhs for Justice … are pursuing Mr. Badal….
>
> Q:    For What?
>
> A:    Human rights violations.

R. 33-1 at 123-24.

In context, Mr. Kalra's testimony regarding his knowledge of the "lawsuit" simply distinguishes between his general knowledge and his specific knowledge once he discovered the actual physical documents, the complaint. The testimony hardly undermines his credibility.[11]

---

[11] Likewise, the affidavits submitted by Plaintiffs along with their brief (R.44, Exhibits E-G) are irrelevant, and certainly do nothing to undermine Mr. Kalra's credibility.

Plaintiffs' argument illustrates their willingness to do virtually anything to keep this case alive -- including baseless attacks on Mr. Kalra, whose involvement came as a result of his attempts to assist the Sikh community in the immediate wake of the horrific, senseless, tragic violence targeted at peaceful citizens.

## CONCLUSION

The evidence proves overwhelmingly and definitively that Chief Minister Badal was not served with the summons and complaint at OCHS on August 9th at 4:50 p.m. The timing and content of the emails, the photographs, and the testimony of the many witnesses who were in the immediate presence of Chief Minister Badal that day, make it physically impossible for the process server's claim to be true. At 4:50 p.m., the Chief Minister was 17 miles north of OCHS, shopping for kitchenware at Boelter Superstore.

Plaintiffs' entire brief is an attempt to shift the burden of proof to the defendant, to require him to prove he was not served. While that is not the law, the Defendant has done so, and by proof beyond any doubt. Plaintiffs also suggest that the Defendant's motion "hangs entirely on the testimony and credibility of Mr. Kalra." R. 43 at 10. That is obviously not the case, in light of the overwhelming evidence that the Chief Minister was not even at Oak Creek High School on August 9th. But at the same time, the Defendant is happy to embrace Mr. Kalra's credible and corroborated testimony.

25

Plaintiffs ignore the burden of proof. They ignore the mountain of evidence demonstrating they failed to effect service. They misconstrue evidence to try to justify or support their outlandish conspiracy theories. And, most troubling, they unfairly and unprofessionally impugn the integrity of witnesses who have no stake or interest whatsoever in this litigation. Their tactics should not be tolerated.

Plaintiffs have failed to prove, by a preponderance of the evidence, they served Chief Minister Badal. The case should be dismissed.

Respectfully submitted this 3rd day of May, 2013.

**BISKUPIC & JACOBS, S.C.**

By: /s/ Michelle L. Jacobs
Michelle L. Jacobs, SBN 1021706
Steven M. Biskupic, SBN 1018217
1045 West Glen Oaks Lane, Suite 106
Mequon, WI 53092
mjacobs@biskupicjacobs.com
Office: 262-241-3300
Fax: 866-700-7640

Attorneys for Parkash Singh Badal